IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

EON CORP. IP HOLDINGS, LLC,

    Plaintiff,

v.

FLO TV INCORPORATED, *et al.*,

    Defendants.

Civil Action No. 10-812-RGA

EON CORP. IP HOLDINGS, LLC,

    Plaintiff,

v.

AT&T MOBILITY LLC,

    Defendant.

Civil Action No. 13-910-RGA

## MEMORANDUM OPINION

Gregory B. Williams, Esq., FOX ROTHSCHILD LLP, Wilmington, DE; Daniel R. Scardino, Esq. (argued), REED & SCARDINO LLP, Austin, TX; Steven P. Tepera, Esq. (argued), REED & SCARDINO LLP, Austin, TX; John L. Hendricks, Esq. (argued), REED & SCARDINO LLP, Austin, TX.

    Attorneys for Plaintiff EON Corp. IP Holdings, LLC.

Karen Jacobs Louden, Esq. (argued), MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; Jennifer Ying, Esq., MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; Megan E. Dellinger, Esq., MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; Heidi Keefe, Esq., COOLEY LLP, Palo Alto, CA.

    Attorneys for Defendant HTC America, Inc.

Michael J. Farnan, Esq., FARNAN LLP, Wilmington, DE; Laura E. Miller, Esq., DURIE TANGRI LLP, San Francisco, CA.

Attorneys for Defendant MobiTV, Inc.

Jack B. Blumenfeld, Esq., MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; Frederick L. Whitmer, Esq. (argued), KILPATRICK TOWNSEND & STOCKTON LLP, New York, NY; Carl E. Sanders, Esq., KILPATRICK TOWNSEND & STOCKTON LLP, Winston-Salem, NC.

Attorneys for Defendant Motorola Mobility LLC.

Karen Jacobs Louden, Esq. (argued), MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; Jennifer Ying, Esq., MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; Megan E. Dellinger, Esq., MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE.

Attorneys for Defendants Sprint and Simplexity.

Jack B. Blumenfeld, Esq., MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; Diana M. Sangalli, Esq. (argued), DUANE MORRIS LLP, Houston, TX; Joseph A. Powers, Esq., DUANE MORRIS LLP, Philadelphia, PA.

Attorneys for Defendant AT&T Mobility LLC.

Richard L. Horwitz, Esq., POTTER, ANDERSON & CORROON LLP, Wilmington, DE; Harrison J. (Buzz) Frahn IV, Esq. (argued), SIMPSON THACHER & BARTLETT LLP, Palo Alto, CA; Victor Cole, Esq., SIMPSON THACHER & BARTLETT LLP, New York, NY.

Attorneys for Defendants FLO TV, Inc. and Qualcomm, Inc.

Steven J. Fineman, Esq., RICHARDS, LAYTON & FINGER, PA, Wilmington, DE.

Attorney for Defendant U.S. Cellular Corporation.

Nitika Gupta, Esq., FISH & RICHARDSON P.C., Wilmington, DE.

Attorney for Defendant LG Electronics MobileComm USA, Inc.

March 4, 2014

*Richard G. Andrews*

**ANDREWS, U.S. DISTRICT JUDGE:**

On September 23, 2010, EON Corp. IP Holdings, LLC filed suit against FLO TV

Incorporated, GoTV Networks, Inc., HTC America, Inc., Kyocera Communications Inc., LG

Electronics MobileComm USA, Inc., LetsTalk.com, Inc., MobiTV, Inc., Motorola, Inc., Palm,

Inc., Qualcomm, Inc., Research in Motion Corporation, SPB Software, Inc., Samsung

Telecommunications America LLC, Sprint Nextel Corporation, U.S. Cellular Corporation,

Verizon Communications Inc., and Wirefly, Corp. (collectively, "FLO TV Defendants") alleging

infringement of U.S. Pat. No. 5,663,757 ("the '757 patent"). (1:10-cv-812 D.I. 1). EON also

claimed infringement of the '757 patent by AT&T Mobility, LLC ("AT&T"),[1] AT&T Mobility

Puerto Rico, Inc., Puerto Rico Telephone Company, Inc., Telecomunicaciones de Puerto Rico,

Inc., Telefonica de Puerto Rico, Inc., and Claro, Inc. in a suit filed in the U.S. District Court for

the District of Puerto Rico on June 14, 2011. (1:13-cv-910 D.I. 1). Judge Carreño-Coll severed

all claims between EON and AT&T relating to the '757 patent from the Puerto Rico case and

transferred them to the District of Delaware. (1:13-cv-910 D.I. 326). The Court then

consolidated the cases for purposes of claim construction on August 7, 2013. (1:10-cv-812 D.I.

559).

Eight terms from the '757 patent are computer-implemented means-plus-function claims,

and they have been singled out for construction in this memorandum opinion. (1:13-cv-910 D.I.

423 at 14).[2] The Court has considered the parties' claim construction briefing (D.I. 383-1 to

383-6; 1:10-cv-812 D.I. 400), appendix (1:10-cv-812 D.I. 401), oral argument on January 8,

2013 regarding claim construction (D.I. 419, 420), an evidentiary hearing on claim construction

---

[1] AT&T and the FLO TV defendants will be collectively referred to as "the Defendants."

[2] Unless otherwise noted, all subsequent citations are to the 1:13-cv-910 docket.

on February 5, 2013 (D.I. 423), and post-hearing briefing (1:10-cv-812 D.I. 891, 892, 896 & 897).

## I. LEGAL STANDARD

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (internal quotation marks omitted). "'[T]here is no magic formula or catechism for conducting claim construction.' Instead, the court is free to attach the appropriate weight to appropriate sources 'in light of the statutes and policies that inform patent law.'" *SoftView LLC v. Apple Inc.*, 2013 WL 4758195, at \*1 (D. Del. Sept. 4, 2013) (quoting *Phillips*, 415 F.3d at 1324). When construing patent claims, a matter of law, a court considers the literal language of the claim, the patent specification, and the prosecution history. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977-80 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Of these sources, "the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (internal quotations and citations omitted).

Furthermore, "the words of a claim are generally given their ordinary and customary meaning . . . [which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1312-13 (internal citations and quotation marks omitted). "[T]he ordinary meaning of a claim term is its meaning to [an] ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted). "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application

4

of the widely accepted meaning of commonly understood words." *Id.* at 1314 (internal citations omitted).

A court may consider extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises," in order to assist the court in understanding the underlying technology, the meaning of terms to one skilled in the art and how the invention works. *Id.* at 1317-19 (internal quotation marks and citations omitted). However, extrinsic evidence is less reliable and less useful in claim construction than the patent and its prosecution history. *Id.*

Moreover, "[a] claim construction is persuasive, not because it follows a certain rule, but because it defines terms in the context of the whole patent." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). It follows that "a claim interpretation that would exclude the inventor's device is rarely the correct interpretation." *Osram GmbH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007) (internal quotation marks and citation omitted).

An additional set of principles governs the construction of means-plus-function terms. The Federal Circuit has recognized a presumption in favor of applying 35 U.S.C. § 112, ¶ 6[3] whenever the word "means" is used in the claim language to describe a limitation. *See Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1366 (Fed. Cir. 2008) ("A claim element that contains the word 'means' and recites a function is presumed to be drafted in means-plus-function format under 35 U.S.C. § 112 ¶ 6."). The presumption can be overcome "where the claim, in addition to the functional language, recites structure sufficient to perform the claimed function in its entirety." *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1375 (Fed. Cir. 2003).

---

[3] Now § 112(f).

5

In order for there to be sufficient structure, the claim language must specify "the exact structure that performs the functions in question without need to resort to other portions of the specification or extrinsic evidence for an adequate understanding of the structure." *TriMed, Inc. v. Stryker Corp.*, 514 F.3d 1256, 1259-60 (Fed. Cir. 2008).

Once it has been determined that the term is written as a means-plus-function limitation, courts employ a two-part test to construe the term. First, the court is required to determine the claimed function. *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1332 (Fed. Cir. 2006). The second step is to "identify the corresponding structure in the written description of the patent that performs that function." *Id.* The identified structure is required to "permit one of ordinary skill in the art to 'know and understand what structure corresponds to the means limitation.'" *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008) (quoting *Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 950 (Fed. Cir. 2007)). Otherwise, the term is invalid. *Id.*

In the special case where the corresponding structure is a computer, the patent must disclose an algorithm for performing the claimed function. "[S]imply disclosing a computer as the structure designated to perform a particular function" is insufficient to limit the scope of the claim under § 112, ¶ 6 because "a general purpose computer programmed to carry out a particular algorithm creates a 'new machine' . . . ." *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008) ("[A] general purpose computer 'in effect becomes a special purpose computer once it is programmed to perform particular functions pursuant to instructions from program software.'" (quoting *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1348 (Fed. Cir. 1999)).

6

The Federal Circuit carved out an exception to this rule, holding that it is "not necessary to disclose more structure than the general purpose processor" when the claimed functions "can be achieved by any general purpose computer without special programming." *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1316 (Fed. Cir. 2011). This exception is a "narrow" one, and an algorithm need not be disclosed "only in the rare circumstances where any general-purpose computer without any special programming can perform the function." *Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1364-65 (Fed. Cir. 2012). Examples of functions that can be carried out by a general purpose computer without special programming include: processing, receiving, and storing. *See In re Katz*, 639 F.3d at 1316 ("Katz has not claimed a specific function performed by a special purpose computer, but has simply recited the claimed functions of 'processing,' 'receiving,' and 'storing.'"). By contrast, any function that involves "more than merely plugging in a general-purpose computer" requires special programming. *Ergo Licensing, LLC*, 673 F.3d at 1365 (finding claim language reciting function of "controlling the adjusting means" to require special programming).

Several recent decisions have addressed the functional capabilities of a general purpose computer. The U.S. District Court for the District of Colorado held that a multi-tasking processing means for "coordinating data transfer" could be accomplished by a general purpose computer without special programming. *EdiSync Sys., Inc. v. Centra Software, Inc.*, 2012 WL 2196047, at *15-17 (D. Colo. June 15, 2012). I previously held that a general purpose computer without special programming could perform the function of displaying an icon. *United Video Props., Inc. v. Amazon.com, Inc.*, 2012 WL 2370318, at *11 (D. Del. June 22, 2012) ("'[D]isplaying' an icon is a common function that can be achieved by any general purpose computer without special programming."); *see also SoftView LLC v. Apple Inc.*, 2013 WL

7

4758195, at *11 (D. Del. Sept. 4, 2013) (finding no algorithm required for "processing means"

claim element because that function could be achieved by a general purpose computer without

special programming).

## II. CONSTRUCTION OF DISPUTED TERMS

### A. The '757 Patent

There are eight computer-implemented claim terms that the Court has been asked to

construe. Claim 8 is representative and recites:

> A local subscriber's data processing station for a wireless television program communication network coupling together a set of interactive subscriber television receiver stations, comprising in combination,
> an operation control system in said data processing station for controlling video signals, system operating modes and interactive communications available to the subscriber,
> a television receiver with a video display screen, program control means and television program channel selection means,
> a plurality of sources of video text and television program channels available from.said network for individual presentation on said display screen in response to operator control by way of paid [sic] operation control system,
> [six additional limitations],
> means responsive to said self contained software for establishing a mode of operation for selection of one of a plurality of authorized television program channels wherein a channel selection menu identifying authorized channels is displayed automatically on said video screen,
> means establishing a first menu directed to different interactively selectable program theme subsets available from said authorized television program channels and means for causing selected themes to automatically display a second menu displaying available television programs relating to that selected theme, means responsive to said subscriber manual control means for selecting a preferred theme from said different themes presented when said first menu is displayed on said screen, and means in said control system for identifying on said second menu said television programs available relating to the selected theme, and
> means controlled by replaceable software means operable with said operation control system for reconfiguring the operating modes by adding or changing features and introducing new menus.

8

'757 patent, claim 8.[4] Each of the disputed terms contains the word "means," and thus a presumption exists in favor of applying § 112, ¶ 6. *See Net MoneyIN, Inc.*, 545 F.3d at 1366. EON only disputes the application of § 112, ¶ 6 with respect to terms 2 and 3. The presumption has not been overcome for either of those terms because the claim language does not recite "structure sufficient to perform the claimed function in its entirety." *Altiris, Inc.*, 318 F.3d at 1375. Therefore, § 112, ¶ 6 applies to all eight terms.

1. "Means under control of said replaceable software means for indicating acknowledging of shipment of an order from a remote station" (claim 7)

a. *Plaintiff's proposed construction*: A means-plus-function limitation. Proposed function: "indicating acknowledging of shipment of an order from a remote station"; proposed structure: "messages displayed on viewing screen 11 in FIGS. 2, 3, and 5."

b. *FLO TV Defendants' proposed construction*: A means-plus-function limitation. Proposed function: "indicating acknowledging of shipment of an order from a remote station"; proposed structure: "Indefinite. No structure is disclosed in the specification."

c. *AT&T's proposed construction*: A means-plus-function limitation. Proposed function: "indicating acknowledging of shipment of an order from a remote station"; proposed structure: "None. Indefinite."

d. *Court's construction*: "Indefinite."

The parties agree this is a means-plus-function term with the function of "indicating acknowledging of shipment of an order from a remote station." The dispute is whether the patent discloses sufficient corresponding structure, *i.e.*, whether a general purpose computer

---

[4] Independent claims 1 and 7-10 were amended during reexamination, and dependent claims 2-6 were found to be patentable after amendment to claim 1. The Reexamination Certificate with the amended claims was issued August 14, 2012. A second reexamination certificate, issued October 21, 2013, did not include any amendments.

9

without special programming in 1991 could perform the claimed function.[5] EON contends that the structure is "messages displayed on viewing screen 11 in FIGS. 2, 3, and 5."[6] The Defendants allege that the patent does not disclose any structure and that the term is indefinite.[7] As described in more detail below, EON's proffered structure is legally insufficient to sustain the term's validity because a general purpose computer in 1991 could not, without special programming, perform the claimed function and no algorithm was disclosed.

Dr. Sauer, EON's expert witness, testified at the evidentiary hearing that the function of "indicating acknowledging of shipment of an order from a remote station" could not be performed by a computer purchased "off-the-shelf." (D.I. 423 at 33 (Q. "It's true, sir, is it not, that you don't know of any general-purpose computer in 1991, that off-the-shelf could perform any of the functions of the computer-implemented terms? A. Off-the-shelf, with the exception of Claim Term [2], all of the computer-implemented terms would require some additional programming.")). The Defendant's expert, Dr. Grimes, agreed that no general purpose computer could perform any of the claimed functions, including "indicating acknowledging of shipment of an order from a remote station." (*Id.* at 63 ("Q. Looking at the functions of the computer-implemented terms in this case, did a general-purpose computer in 1991, perform any of them? A. No. I've examined the terms, as they have been agreed to by the parties in this exhibit that

---

[5] Because all eight terms at issue here are computer-implemented means-plus-function terms, the experts largely discussed the terms together without focusing on any particular term's function or structure. Therefore, the analysis regarding whether a general purpose computer with no algorithm constitutes sufficient structure under § 112, ¶ 6 is equally applicable to each of the subsequent terms. The parties also agree on the function for each term except one, and that term is addressed individually later in this opinion. (1:10-cv-812 D.I. 900 Plaintiff's Exhibit 4; Defendant's Exhibit 4).

[6] EON's structure is insufficient because there is no explanation in the specification as to how the displayed messages are generated, other than by a "microprocessor." '757 patent, Figs. 3 and 5; *see also Ibormeith IP, LLC v. Mercedes-Benz USA, LLC*, 732 F.3d 1376, 1379 (Fed. Cir. 2013).

[7] The Defendants modified the proposed structure for this term after Dr. Sauer, EON's expert, wrote his declaration in support of EON's claim construction. EON contends this caused prejudice because it was too late for Dr. Sauer "to address their argument with respect to the computer-implement[ed] style argument they had changed it to." (D.I. 420 at 59). The prejudice that EON suffered, if any, was cured by the evidentiary hearing where both experts had the opportunity to provide their opinions based on the parties' most up-to-date constructions.

10

we've been referring to earlier, and for those functions, none of those functions were available on a general-purpose computer.")).

Not only could a general purpose computer bought off-the-shelf in 1991 not perform the function in question, but the experts agree that off-the-shelf software in 1991 would not have been capable of performing the claimed function either. (*Id.* at 38-39 ("Q. Well, [Dr. Sauer], are you aware of any off-the-shelf software applications that a person could have purchased in 1991, to perform without additional software programming, any of the computer-implemented functions of the patent? A. Off-the-shelf software by itself would not be able to implement these computer-implemented terms without additional programming. Q. So the answer is no? A. If I understand the question, the answer is no." (objection omitted)); *id.* at 63 ("Q. And, [Dr. Grimes], let [] me ask you the second question, the big question that I asked Dr. Sauer, were there any commercially-available software applications in 1991, that a consumer could purchase off-the-shelf to perform any of the functions of the computer-implemented terms? A. Not—not that I'm aware of. I mentioned the hardware and software that my company produced, but I'm not aware of anything besides that. Q. And that hardware and software, so that didn't actually perform any of the functions that we're talking about today for Mr. Morales' patent, did it? A. That's correct.")). Instead, special code would have to be written in order to accomplish the claimed functionality. (*Id.* at 40 ("Q. I want to ask you now, [Dr. Sauer], if the function of the computer-implemented terms were not going in the general-purpose computer, and they were not performable by off-the-shelf software applications in 1991, it's true that someone would have to

11

write a computer program to accomplish those functions, correct? A. Someone would have to write a computer program to accomplish the functions of the claim terms.")).[8]

The fact that neither a store-bought computer nor a store-bought computer with store-bought software could achieve the claimed function places this case outside of the *Katz* exception. As stated above, in order to take advantage of the means-plus-function framework, the patentee must disclose the corresponding structure. In the case of a computer-implemented term, that structure is the algorithm. A narrow exception exists, thereby exempting the patentee from the algorithm requirement, if the function could be performed by a general purpose computer without "special programming." The exception's application turns on the meaning of "special" programming—*some* programming must be permissible, but not *special* programming. If that were not the case, the Federal Circuit's use of "special" to describe programming would be rendered superfluous.

In my view, the proper distinction between "special programming" and "programming" is whether the programming in question is commercially available at the time of the invention. If the programming required to perform the claimed function can be purchased off-the-shelf, then it is ordinary programming and no algorithm is required to comply with § 112, ¶ 6's structure requirement. A general purpose computer is sufficient structure in this situation. If, however, a store-bought computer combined with off-the-shelf programming cannot perform the claimed function, then there is a need for special programming, and § 112, ¶ 6 therefore mandates the disclosure of an algorithm. *See Ergo Licensing, LLC*, 673 F.3d at 1365 ("A specially adapted computer is not a general-purpose computer."); *Aristocrat Techs. Austl. Pty Ltd.*, 521 F.3d at

---

[8] Mr. Morales, the inventor, also gave deposition testimony suggesting that one or more engineers were required to complete the necessary programming. (1:10-cv-812 D.I. 649-5 at 5 ("Q. If you didn't personally write that software, who would have been the one to write it? A. We have hundreds of engineers, you cannot imagine.")).

1333 (noting that a "new machine" is created when "a general purpose computer [is] programmed to carry out a particular algorithm"). This framework is consistent with the Constitution's stated purpose of "promot[ing] the progress of science and useful arts" in exchange for a limited, government-sanctioned monopoly. U.S. CONST. art. I, § 8. If the required programming is more sophisticated than what can be readily purchased by a consumer, then the algorithm must be disclosed as the quid pro quo for receiving patent protection.

Processing, receiving, storing, and displaying an icon are functions that any general purpose computer purchased off-the-shelf is capable of performing, which is why no algorithm is required. *See Katz*, 639 F.3d at 1316; *United Video Props., Inc.*, 2012 WL 2370318, at *11.[9] The function at issue here, "indicating acknowledging of shipment of an order from a remote station," is more complicated. EON implicitly conceded as much when its expert stated that no store-bought software installed on a general purpose computer in 1991 could achieve it without additional programming by the user. (D.I. 423 at 40 ("Someone would have to write a computer program to accomplish the functions of the claim terms.")). Without disclosing the algorithm, the public is left without any knowledge of how to carry out the performed function. This is particularly true when there are numerous ways to write even the most simple of computer programs. *(Id.* at 44 ("Q. Sir, [is it] true that not every programmer is going to write a computer program the same way? A. Different programmers have different styles of how they want to do things. Every person has their own probably fairly unique style for exactly how they write a program.")). Dr. Sauer believed that the lack of disclosure was not fatal to EON's case because a

---

[9] The claim construction in *United Video Properties* is currently on appeal. Nonetheless, I felt competent as a computer user to conclude based on personal experience that for a long time general purpose computers with no special programming could display icons. I thought the input of experts was necessary here to resolve the dispute about the capabilities of a computer in 1991. Both experts, I thought, were well-qualified and credible. On the important points, I thought they essentially agreed with each other.

13

"person of relatively elementary skill in the art" could write the code that would perform the function at issue. (*Id*. at 41). But that is inconsequential to the current inquiry. The test is not whether a PHOSITA could write the necessary computer program, but whether the patentee taught the public how to accomplish the claimed function in the specification by disclosing the algorithm. The patentee is required to disclose this expertise in exchange for patent protection. Without it the claim term cannot stand.

In sum, the claimed function of "indicating acknowledging of shipment of an order from a remote station" is indefinite. Pursuant to § 112, ¶ 6's structure requirement, the patentee must disclose an algorithm for carrying out the claimed function unless it could be accomplished by a general purpose computer without special programming—the *Katz* exception.[10] In this case, special programming is needed because off-the-shelf software, when installed on a general purpose computer, cannot perform the claimed function. The *Katz* exception does not apply in this situation, so the algorithm must be disclosed. The patentee here failed to disclose an algorithm, relying instead on a general purpose computer to satisfy the structure requirement. This is insufficient, and the claim term is indefinite as a result.

2. "Means controlled by replaceable software means operable with said operation control system for reconfiguring the operating modes by adding or changing features and introducing new menus" (claims 1-6, 8-10)

    a. *Plaintiff's proposed construction*: No construction necessary. Alternatively, if this is a means-plus-function limitation, the function is "reconfiguring the operating modes by

---

[10] I do not think the Federal Circuit's recent decision, *Elcommerce.com, Inc. v. SAP AG*, 2014 WL 685622 (Fed. Cir. Feb. 24, 2014), is relevant to the dispute in this case. *Elcommerce* did not involve the application of the *Katz* exception.

adding or changing features and introducing new menus," and the structure is "software controlled programmable microprocessor data processing system 27."

b. *FLO TV Defendants' proposed construction*: A means-plus-function limitation. Proposed function: "reconfiguring the operating modes by adding or changing features and introducing new menus"; proposed structure: "Indefinite. Structure is microprocessor but no algorithm disclosed."

c. *AT&T's proposed construction*: A means-plus-function limitation. Proposed function: "reconfiguring the operating modes by adding or changing features and introducing new menus"; proposed structure: "microprocessor 35 and external software 8' (FIG. 4), and statutory equivalents."

d. *Court's construction*: "Indefinite."

As discussed above, EON failed to overcome the presumption that § 112, ¶ 6 does not apply to this term. The parties are in agreement over the function. The only issue left for determination is whether the term is indefinite for failing to disclose sufficient structure. During his testimony, Dr. Sauer distinguished this term from the other seven, explaining that he did not believe "reconfiguring the operating modes by adding or changing features and introducing new menus" required any programming to accomplish. (*Id*. at 33 ("Q. It's true, sir, is it not, that you don't know of any general-purpose computer in 1991, that off-the-shelf could perform any of the functions of the computer-implemented terms? A. Off-the-shelf, with the exception of Claim Term [2], all of the computer-implemented terms would require some additional programming. I believe Claim Term [2] could be implemented without additional programming.")). It is Dr. Sauer's opinion that the operating system, by itself, is capable of providing this functionality. (*Id*. at 23 ("A. I would assume that an ordinary user would select a program to be executed,

15

alternate programs from one that is currently running. That [is] something that would be done

routinely with the operating system software that is provided. Q. So, in other words, no

additional programming at all? A. No additional programming.")). When questioned on cross-

examination, however, Dr. Sauer conceded that additional programming by someone would be

required to perform the function of this claim term:

> Q. Just so we're clear, sir, it is your opinion that a person of ordinary skill
> in the art would have to program a 1991 general-purpose computer, as you have
> used that term, to perform the menu functions from Term [2]?
>
> A. Perform[ing] the menu functions from Term [2] would require either—
> would require additional programming by someone. It might be provided by an
> off-the-shelf application, which is why my original interpretation of Claim [2—]
>
> Q. All right. Just so we're clear—
>
> A. Someone would do that programming.
>
> Q. Programming to accomplish the agreed function of Claim Term [2]
> requires additional programming, we've agreed on that?
>
> A. To introduce the menus requires additional programming.
>
> Q. And the reason that you need additional programming for the computer-
> implemented terms is because the functions that they perform were not going [to
> be] part of the operating system on a general-purpose computer?
>
> A. An operating system would not provide the function in these claim
> terms.
>
> Q. In fact, the specific capabilities of these claim terms were not
> performable by any of the operating systems that came loaded or could be loaded
> onto a general-purpose computer; is that correct?
>
> A. The operating systems, by themselves, as they came loaded or purchased
> off-the-shelf to be installed, would not provide the functions of these claim terms.
>
> Q. And that's why you needed additional programming?
>
> A. That's why additional programming is needed.

(*Id.* at 36-37). Dr. Grimes testified that additional programming was required. (*Id.* at 75-76 ("Q.

Again, back in 1991, was there a commercially-available software that would perform this

function for an interactive TV system? A. No, there was not. The interactive TV aspect of it

was really not available off-the-shelf and certainly wasn't present in the standard general-

purpose computers of the day. Q. So, if it wasn't available off-the-shelf in an application for a

16

general-purpose computer, what would you have to do?  A.  Well, you would have to write the software and add the hardware, in some cases, to be able to implement these functions.  In this case this function of [term 2].")).[11]  Because additional programming would be required, this term is indistinguishable from the other disputed terms for purposes of claim construction.  For the reasons stated in section II.A.1, *supra*, a general purpose computer without special programming in 1991 could not perform the claimed function.  This renders the *Katz* exception inapplicable.  In order to avoid a finding of indefiniteness, therefore, the '757 patent must disclose an algorithm to accomplish the function.  It does not, and the term is indefinite as a result.

 3.  "Means responsive to said self contained software for establishing a mode of operation for selection of one of a plurality of authorized television program channels" (claim 8)

  a.  *Plaintiff's proposed construction*: No construction necessary.  Alternatively, if this is a means-plus-function limitation, the function is: "establishing a mode of operation for selection of one of a plurality of authorized television program channels," and the structure is: "microprocessor 35 and menus shown in Figs. 3-5 and statutory equivalents."

  b.  *FLO TV Defendants' proposed construction*: A means-plus-function limitation.  Proposed function: "establishing a mode of operation for selection of one of a plurality of authorized television program channels"; proposed structure: "Indefinite.  Structure is microprocessor but no algorithm disclosed."

---

[11] To the extent there is a factual dispute between the experts on this point, Dr. Sauer's tentative testimony that the functionality "might" be provided in an off-the-shelf application is less persuasive than Dr. Grimes's unequivocal statement that store-bought software was insufficient to perform term 2's function.  I find that the evidence is clear and convincing that in 1991 store-bought software was insufficient to perform the identified function.

17

c. *AT&T's proposed construction*: Proposed function: "establishing a mode of operation for selection of one of a plurality of authorized television program channels"; proposed structure: "microprocessor 35 and menus shown in Figs. 3-5 and statutory equivalents."

d. *Court's construction*: "Indefinite."

As discussed above, EON failed to overcome the presumption that § 112, ¶ 6 does not apply to this term. The parties agree on the function. The only issue left for determination is whether the term is indefinite for failing to disclose sufficient structure. For the reasons stated in section II.A.1, *supra*, a general purpose computer without special programming in 1991 could not perform the claimed function. This renders the *Katz* exception inapplicable. In order to avoid a finding of indefiniteness, therefore, the '757 patent must disclose an algorithm to accomplish the function. It does not, and the term is indefinite as a result.

4. "Means establishing a first menu directed to different interactively selectable program theme subsets available from said authorized television program channels" (claim 8)

a. *Plaintiff's proposed construction*: Not governed by 35 U.S.C. § 112, ¶ 6. Alternatively, if this is a means-plus-function limitation, the function is "establishing a first menu directed to different interactively selectable program theme subsets," and the structure is "microprocessor 35 and program control software."

b. *FLO TV Defendants' proposed construction*: A means-plus-function limitation. Proposed function: "establishing a first menu directed to different interactively selectable program theme subsets available from said authorized program channels"; proposed structure: "Indefinite. Structure is microprocessor but no algorithm disclosed."

c. *AT&T's proposed construction*: A means-plus-function limitation. Proposed function: "establishing a first menu directed to different interactively selectable program theme

18

subsets available from said authorized television channels"; proposed structure: "indefinite" or "text generator NTSC format 25, modulator 26, microprocessor 35, menu 11', stored information as described at 6:4-8 and external software 8', and statutory equivalents."

d. *Court's construction*: "Indefinite."

The parties disagree over both the function and the corresponding structure, although the Defendants allege that the term is indefinite regardless of which proposed function is correct. (1:10-cv-812 D.I. 400 at 89 ("[W]hether that function is construed as 'establishing a first menu directed to different interactively selectable program theme subsets,' as EON proposes, or also includes the language 'available from said authorized television program channels,' as the law requires, *Lockheed*, 324 F.3d at 1319, the outcome is the same: neither function can be performed by simply plugging in a general purpose computer.")). The Court agrees that both proposed functions would require additional programming and adopts EON's construction. (D.I. 423 at 37 ("The operating systems, by themselves, as they came loaded or purchased off-the-shelf to be installed, would not provide the functions of [the computer-implemented] claim terms.")). For the reasons stated in section II.A.1, *supra*, a general purpose computer without special programming in 1991 could not perform the claimed function. This renders the *Katz* exception inapplicable. In order to avoid a finding of indefiniteness, therefore, the '757 patent must disclose an algorithm to accomplish the function. It does not, and the term is indefinite as a result.

5. "Means for causing selected themes to automatically display a second menu" (claim 8)

    a. *Plaintiff's proposed construction*: A means-plus-function limitation. Proposed function: "causing selected themes to automatically display a second menu"; proposed structure: "microprocessor 35 and program control software (Figs. 3-5)."

    b. *FLO TV Defendants' proposed construction*: A means-plus-function limitation. Proposed function: "causing selected themes to automatically display a second menu"; proposed structure: "Indefinite. Structure is microprocessor but no algorithm disclosed."

    c. *AT&T's proposed construction*: A means-plus-function limitation. Proposed function: "causing selected themes to automatically display a second menu"; proposed structure: "indefinite" or "text generator NTSC format 25, modulator 26, microprocessor 35, menu 11', stored information as described at 6:8-14 and external software 8', and statutory equivalents."

    d. *Court's construction*: "Indefinite."

The parties agree on the function. For the reasons stated in section II.A.1, *supra*, a general purpose computer without special programming in 1991 could not perform the claimed function. This renders the *Katz* exception inapplicable. In order to avoid a finding of indefiniteness, therefore, the '757 patent must disclose an algorithm to accomplish the function. It does not, and the term is indefinite as a result.

6. "Means controlled by replaceable software means operable with said operation control system for establishing and controlling a mode of operation that records historical operating data of the local subscriber's data processing station" (claim 9)

    a. *Plaintiff's proposed construction*: A means-plus-function limitation. Proposed function: "establishing and controlling a mode of operation that records historical operating data

of the local subscriber's data processing station"; proposed structure: "microprocessor 35 and system control 8 (FIG. 3)."

        b. *FLO TV Defendants' proposed construction*: A means-plus-function limitation. Proposed function: "establishing and controlling a mode of operation that records historical operating data of the local subscriber's data processing station"; proposed structure: "Indefinite. Structure is microprocessor but no algorithm disclosed."

        c. *AT&T's proposed construction*: A means-plus-function limitation. Proposed function: "establishing and controlling a mode of operation that records historical operating data of the local subscriber's data processing station"; proposed structure: "indefinite" or "microprocessor 35, external read only memory software storage unit 7 as described at 5:40-43, and statutory equivalents."

        d. *Court's construction*: "Indefinite."

    The parties agree on the function. For the reasons stated in section II.A.1, *supra*, a general purpose computer without special programming in 1991 could not perform the claimed function. This renders the *Katz* exception inapplicable. In order to avoid a finding of indefiniteness, therefore, the '757 patent must disclose an algorithm to accomplish the function. It does not, and the term is indefinite as a result.

    7. "Means controlled by replaceable software means operable with said operation control system for establishing and controlling fiscal transactions with a further local station" (claim 10)

        a. *Plaintiff's proposed construction*: A means-plus-function limitation. Proposed function: "establishing and controlling fiscal transactions with a further local station"; proposed structure: "microprocessor 35 and system control 8 (FIG. 3)."

b. *FLO TV Defendants' proposed construction*: A means-plus-function limitation. Proposed function: "establishing and controlling fiscal transactions with a further local station"; proposed structure: "Indefinite. Structure is microprocessor but no algorithm disclosed."

c. *AT&T's proposed construction*: A means-plus-function limitation. Proposed function: "establishing and controlling fiscal transactions with a further local station"; proposed structure: "indefinite" or "microprocessor 35, external read only memory software storage unit 7 as described at 5:43-47, PROM (subscriber ID) 31 as described at 3:56-60 & 5:32-34, and statutory equivalents."

d. *Court's construction*: "Indefinite."

The parties agree on the function. For the reasons stated in section II.A.1, *supra*, a general purpose computer without special programming in 1991 could not perform the claimed function. This renders the *Katz* exception inapplicable. In order to avoid a finding of indefiniteness, therefore, the '757 patent must disclose an algorithm to accomplish the function. It does not, and the term is indefinite as a result.

8. "Means for establishing an accounting mode of operation for maintaining and reporting fiscal transactions incurred in the operation of the local subscriber's data processing station" (claim 10)

a. *Plaintiff's proposed construction*: A means-plus-function limitation. Proposed function: "establishing an accounting mode of operation for maintaining and reporting fiscal transactions incurred in the operation of the local subscriber's data processing station"; proposed structure: "microprocessor 35 and system control 8 (FIG. 3)."

22

b. *FLO TV Defendants' proposed construction*: A means-plus-function limitation. Proposed function: "establishing an accounting mode of operation for maintaining and reporting fiscal transactions incurred in the operation of the local subscriber's data processing station"; proposed structure: "Indefinite. Structure is microprocessor but no algorithm disclosed."

c. *AT&T's proposed construction*: A means-plus-function limitation. Proposed function: "establishing an accounting mode of operation for maintaining and reporting fiscal transactions incurred in the operation of the local subscriber's data processing station"; proposed structure: "indefinite" or "microprocessor 35, RF beep transmitter 30, external read only memory software storage unit 7 as described at 5:40-43, PROM (subscriber ID) 31 as described at 3:56-60 & 5:32-34, external software 8', and statutory equivalents."

d. *Court's construction*: "Indefinite."

The parties agree on the function. For the reasons stated in section II.A.1, *supra*, a general purpose computer without special programming in 1991 could not perform the claimed function. This renders the *Katz* exception inapplicable. In order to avoid a finding of indefiniteness, therefore, the '757 patent must disclose an algorithm to accomplish the function. It does not, and the term is indefinite as a result.

## III. CONCLUSION

For the reasons set forth above, the eight computer-implemented means-plus-function terms are indefinite. An appropriate order will follow.

23